Okay, if Council are ready, let's move to the next one, which is 23-1063 Young v. Colorado Department of Corrections. Mr. Trachman. Good morning, Your Honors, and may it please the Court, I'd like to reserve two minutes for rebuttal. William E. Trachman for Appellant Josh Young, who is here with us today in the Court. Josh was a rising star in the Lyman Correctional Facility in 2021, when defendants implemented mandatory equity, diversity, and inclusion training for all employees. As CDOC acknowledged, extensively addressed race, racial issues, and racial inequality. CDOC even argues on page 39 of its answer brief that the training had the extremely ambitious goal of eradicating race discrimination. And on page 4 of their brief, they specifically point to this glossary of terms, which is Exhibit 1 to the complaint. After months of being intimidated by his employer, after having his life put at risk and the safety of the entire prison put at risk, Josh resigned in the summer of 2021. Josh adequately pled a Title VII claim for hostile work environment based on race, but the District Court erred in dismissing that claim in several ways. First, it under-read Josh's allegations to suggest that he didn't actually review the materials that were expressly mentioned, expressly quoted, described as training materials for Josh and other employees, and then for good measure also attached to the complaint. Second, it placed weight on the idea that parts of the training were merely optional, when in fact Josh pled that the exhibits to the complaint were recommended by his employer, described as other tools and resources. And even their response to Josh's internal administrative complaint within the prison was that these materials were, quote, required. Third, the District Court erred by focusing excessively on the fact that Josh only took the EDI training once, when the training actually instructs him and all of his colleagues to use the glossary as common language, actually to live the training on a day-by-day basis. And they did that during the months following, and the fact that Josh knew that the EDI training would recur year after year after year. One thing I was curious about, and I couldn't find it, but what was the actual training module? This is something that he watched online, presumably at the office or at home, and we have the glossary and some of the other attachments, but what was the actual training? We don't have that in the record, do we? Well, so there are three parts of the actual mandatory training that are in the record. The glossary was part of it, the slide that says other tools and resources, and the equity continuum. Yeah, but weren't those links from some... Those were actually part of the modules themselves. So the glossary, the slide, which is Exhibit 2 to the complaint, and the equity continuum, which is Exhibit 5. Then there were also four modules that you had to click through in order to complete the training. So there wasn't any oral training? There wasn't a speaker? That's correct, Your Honor. You went through a master document, and then you could get to the appendices or whatever? That's right. So you did these four modules on the computer, and then at the end of the fourth module is the slide in Exhibit 2 that says other tools and resources. But wouldn't it be important for us to see what was kind of the primary training document to evaluate the severity and pervasiveness of the... I'm sure that would be helpful, Your Honor. We don't think that it's necessary to state a claim here. But on remand, we will certainly include extensively all of the mentions of race. We've done that in the new complaint that we filed in the district court since the appeal. But absolutely there are, as the appellees admit, numerous mentions of race, racial issues, racial conflict, racial equality. All of those are supposed to refer back to the glossary that mentions race as the thing that whites use to oppress people of color. You mentioned four modules. Did the complaint allege how long it takes to work through the modules? What's the screen time? Yeah, so the complaint doesn't say it's a matter of hours. It's less than a full workday in terms of working through the modules. Like any workplace training, you do it and it's done. This was unique in the sense that you had to not just complete the training, but when you look at the glossary, it says use the common language, live this training, adopt the beliefs that are in this training. No, I understand, but it's less than a day. That's right, Your Honor, but we think the district court erred by emphasizing that the training itself only took a little bit of time because the actual work environment is meant to be affected. That's the entire point of CDOCS training is that the training is lived. And so to the extent that they say we were trying to eradicate racial discrimination, we were trying to curtail racial inequality in the workplace, they were making these statements because they wanted to affect the workplace. That would be true of most workplace training, wouldn't it? I mean, you wouldn't do training if you didn't think it should have an application in the workplace. I think that's right, Your Honor. In the Orlando case, which is an SDNY case that we cited, is one of the cases where the plaintiffs had very few allegations. There were two showings of a parody video involving an actor playing Adolf Hitler, two showings at a mandatory training. Obviously, in that case, no one was saying Hitler was right or was saying to his colleagues, you ought to be suffering from anti-Semitism based on this video. And they didn't mean that Hitler ought to be praised in the workplace thereafter. It was part of a training process. It was a parody video. They were trying to make a joke. Here, this is unique. This was, yes, you absolutely live this, live this document, live these words, and treat your colleagues affirmatively differently based on their race. So Exhibit 5, the equity continuum, says that people in the workplace need to be treated differently based on their social factors like race. So in the cases that the Tenth Circuit has decided in Lowndes, for instance, where the N-word was used, the plaintiff wasn't asked to believe that she was the N-word. In Tatamy, where the plaintiff had N-word go home, carved on his locker, the plaintiff wasn't asked to believe that he ought to go home because of his race. Here, Josh was told to believe that he is a racist, that he's a white supremacist, that furthers white supremacy in the prison in a highly volatile, racially charged environment, and where the employer itself was saying to all of his colleagues, Josh needs to be treated differently based on his race. How long after the training did he resign? Four months, Your Honor, after filing an internal complaint and saying, we've got problems here. This is a big deal. And his employer responded saying, not only do we not agree with you, we will not even investigate your complaint. Subjectively, I think it's obvious that Josh felt harassed and resigned based on this training. Objectively, we would just say that anyone who's undergoing all these insults, especially if you're a Jew being told about Jewish privilege or an African American being told about terrible stereotypes about African Americans, that would be a hostile environment objectively. Go ahead. Did you allege that he was constructively discharged in your complaint? We don't allege that he was constructively discharged. We allege that the resignation occurred because of the training and that in terms of the subjective factor for the hostile work environment, that establishes the subjective factor. And then we rely on the generalization about the training for the objective factor. Now, we also think that the broad standard here is important. There's no talismanic number. Let me back you up here. So, if you don't allege that you have a constructive discharge, how do you seek reinstatement? It seems to me that cases where reinstatement is on the table aren't ones where there has to be an affirmative allegation that you were discharged. You don't generally just quit and get reinstatement as your remedy. You either have to affirmatively quit or you have to be affirmatively discharged or constructively discharged. Do you agree with that? I'm not sure, Your Honor. Constructive discharge is a theory related to hostile work environment, and we allege that he was forced out of his position. We don't bring a separate cause of action for constructive discharge. In terms of the relief, we've pleaded for back pay, front pay, and also reinstatement, which the district court recognized was one of the forms of relief that plaintiffs are entitled to under Title VII. We would also envision that under Title VII's broad equitable powers that a court would be able to say, Josh is reinstated, but also get rid of the hostile work environment because this training can't continue once Josh is back in the workplace. We also plead those other things because we don't know whether the workplace, now that it's been sent to reeducation camp, whether it can be deprogrammed after two years. So we have a number of options in terms of our prayer for what can happen, whether that's back pay, front pay, reinstatement. But certainly Josh would like to be reinstated, and that's why he brings the equal protection claim against the individual defendants. I'm sorry. Go ahead. No, you go ahead. Well, this is just a follow-up to what you just said. The response brief says that Mr. Young concedes that if the court upholds the dismissal of the Title VII claim, he lacks standing to bring the equal protection claim. So that's a characterization of your position. Yes, Your Honor. And I need to know if you agree with that. Well, that's my brief, Your Honor. Yes, I agree with that because the point is – Well, that's your brief. Yes, that's right. Okay, so if the Title VII claim falls, the equal protection claim falls on standing. That's correct, Your Honor. So the district court accidentally got it right because we think that the reinstatement is the linchpin to the second claim. That's based on the Friends of the Earth case, which says if you are imminently harmed, you have standing to bring an equal protection case. So Josh can't be just reinstated. He can't just go back to work tomorrow without having some assurance that there won't be new discriminatory materials tomorrow. For instance, if they change a few words on the glossary and say, well, you're not really a white supremacist, you're more just a person who really favors whites above other races, that would still be discriminatory training. The point of the equal protection claim is to obtain an injunction against the director of the CDOC and the director of the Office of Health Equity to not promulgate future trainings. So if Josh doesn't get reinstatement, then there's no injury to the fact that those future trainings aren't developed. Thank you. The training was the precipitating cause for his resignation. Are there any other allegations of workplace conduct? Was he criticized by a supervisor or coworker? I mean, is there anything else in the workplace that was affected by this training that affected him directly? So we allege that the employer was affirmatively trying to create a hostile environment, knowing that this training was going to cause that, that we didn't allege any specific clashes or name names about his colleagues. We do say that there was a culture of distrust and suspicion in the workplace, that the safety and the order and the lives of people in the prison were put in danger, and that this training was going to recur from year to year, so it would continue to have a multiplier effect on the workplace. To your question, there's no colleague named that made a specific racial insult to Josh or said to Josh, you know, based on the training, I do think that you're a white supremacist. These allegations are based on the fact that the employer itself was making these offensive statements. Don't we need something more than the training, though, to demonstrate severe and pervasive anti-white conditions in the workplace? We don't think so, Your Honor. In Orlando, it was just two showings of a parody video with an actor playing Hitler. In another case we cite in the Fifth Circuit, their punitive damages were awarded when an employer brought a gorilla in to mock black employees. There didn't have to be another incident with other employees. Were those hostile workplace cases? Yes, exactly. Yes, Your Honor. So those are cases where the employer itself is creating a hostile work environment and actually knows that it's doing that. We cite a case out of the Seventh Circuit where a SWAT team, an employer was actually developing dangerous training materials to create a hostile work environment in order to push employees out of the workplace. All of those involve an employer directly interacting with an employee. There's no requirement that other colleagues reiterate and echo the training itself. I would like to reserve two minutes for rebuttal. You may begin. Good morning, and may it please the Court. My name is Pavan Nelson, and I represent the Colorado Department of Corrections, Mr. Williams, and Ms. Hunsaker Ryan. As citizens in a democratic society, even if we don't always agree. Employers across this country have adopted EDI programs to discuss and perhaps address discrimination and inequalities that we still see in our country today. They've adopted these programs so that people can talk about these issues, so that maybe we can improve our workplaces and get over these issues. In this case, Mr. Young watched a single EDI training as part of his employment with the Colorado Department of Corrections. He disliked it. He disagreed with it. He got offended, so he decided to quit and pursue other career opportunities. But Mr. Young's subjective disagreement with certain concepts, many of which weren't even discussed in the training modules themselves, does not make this EDI training unlawful. Title VII is not a civility code, and it certainly doesn't prohibit employers from discussing issues of public concern with their employees. What Mr. Young experienced was not discrimination and certainly not a hostile work environment under Title VII. By bringing this lawsuit, Mr. Young had an obligation to state a plausible claim for relief. In his amended complaint, he failed to plead facts sufficient to show harassment that was severe or pervasive under Title VII. It's true, though, that this EDI policy is the official policy of the state of Colorado and intended to be disseminated to all of its employees, including the Department of Corrections, and it's forward-looking, ongoing, and permanent, correct? I wouldn't say that, Your Honor. I would say at the time when this training was given, this was a training that the state provided. And it still does, right? I don't believe this training is still provided. Okay, so are you saying then this was just a one-off training and that it's not an ongoing policy of the Department of Corrections? I'm saying a specific policy. I don't quite know what the Department is going to do in the future, but I would say that even if you do do an EDI training, my overall point is you can't prevent employers from talking about issues of public concern, and it needs to qualify Title VII standards. Well, it is. I mean, if you're saying it's just kind of a debating module, that's one thing. But, I mean, it's true if you flip the races, flip the religion, and use some of these materials, they might be considered highly offensive to, say if you made it a white supremacy module, it might be highly offensive to a black employee. If you highlighted religious differences, it might be highly offensive to a different religion. Doesn't that create some kind of objective hostility within the workplace? An employee would feel targeted. Mr. Young felt targeted by these materials based on the links, the glossary of equity terms, for example, sets forth kind of an ideology from a certain intellectual perspective that he may disagree with. At some point, can't that rise to the level of a hostile workplace? I mean, as a theoretical matter, perhaps. My general point, Your Honor, is you need to be analyzing these issues through the Title VII lens of totality of circumstances, context matters, severe and pervasive. It has to be a steady barrage. You kind of broke it down a minute ago. Harassment, severe, pervasive. Could you give us your argument using those elements of a hostile work environment claim? Why was it not any one of those things in your view? Sure, Your Honor. I think we should start with the glossary itself. First of all, Mr. Young, in his argument, he's alleging that somehow this was part of a training. We don't concede that. For the purposes of the 12B6 motion, we had to take the allegations as pled. So the glossary, he attached it to the complaint. And what we have there is a glossary that spans 15 pages, 66 terms, and he's really focusing on four. BIPOC, white fragility, white exceptionalism, and race. Now, those first three terms, BIPOC, white fragility, and white exceptionalism, were never used in the training itself. He makes no allegations that they were. They were never discussed in the workplace. They were never directed at in the workplace. How do you get to the glossary? Is the glossary not part of the training? No, it was not part of the training, Your Honor. It was not part of the modules of the training. Was it a recommended reading? It was not a recommended reading. Personally, I honestly don't understand how the glossary was found in the context of this case. But it was not part of the module, so it's not a recommended reading. Well, then should we be evaluating the glossary? Are you arguing that the glossary shouldn't even be evaluated at all in our consideration of the hostile work environment claim? I guess what I'm saying is they attached it to the complaint, and so we have to take the complaint and evaluate whether or not the allegations of the complaint actually satisfy Title VII. Well, if the complaint alleges that the glossary was part of the training, do we have to accept that as a well-pledged allegation of fact? No, I don't believe you need to, Your Honor. All he said it was based upon, and I think the district court correctly recognized or commented was that doesn't explain what that meant. There was no factual allegations describing the glossary's incorporation in the training materials. Nothing like that. If that's so, I'm a little confused, then, when I ask you to work through the elements, that you jump straight to the glossary. Why don't you focus on what you think was adequately alleged in the training, as training? As training? I mean, wasn't the complaint dismissed for failure of state of claim? Yes, Your Honor. Okay, and why did it fail the state of claim? It failed the state of claim because he failed to allege specific facts to indicate that there was actually harassment and that it was severe and pervasive. And so I jumped to the glossary because that was, you know, that's a major element of what Mr. Young is alleging in this case. But he alleged that those were harassing statements. At the motion to dismiss, should we credit that? Are you saying as a matter of law, the glossary does not contain harassing material? I think the court can analyze the glossary. Since it's attached to the complaint, the court can analyze it and look at it from an objective standpoint and make that determination that it was not harassing statements. For example, he seizes on the term. I mentioned BIPOC, bisexualism, every use. Race was used, and he takes exception to the definition of race in the glossary. And I would just point out that that is not a radical definition of race at all. And I think to see that, all we need to do is look at Justice Thomas's concurrence in Students for Fair Admissions where he uses the same definition of race in his discussion of the college admissions. In that case, Justice Thomas explained that race is a social construct. It is ephemeral. It's based upon nothing. The skin tone is based upon nothing. And that it was used by white elites to exclude Jews and white immigrants. Well, I don't think they're saying everything in the glossary is objectionable. On the whole, they're saying that at least Mr. Young perceived it as targeting him because of his race and forecasting that the department's going to treat him differently because of his race. Either prohibit advancement or it might affect the terms of his employment. So that's what we're left with from the complainant, the motion to dismiss stage. Don't we have to credit those allegations? You can credit Mr. Young's subjective beliefs. But again, for Title VII, there needs to be an objective standpoint to it as well. And that's why I'm discussing it in terms of this. And I think during your discussion with Mr. Trackman, Judge Timkevich, you mentioned the fact, where's the connection with the actual training itself? What happened in the workplace? Did a supervisor say anything? Did anything happen? And there's no allegations that anything did actually happen in the workplace following the training. He didn't receive any negative comments from any supervisors, no physical threatening activity. His compensation wasn't affected in any way. And so you think that's necessary? I think when you look at a Title VII claim, looking at the totality of circumstances, there needs to be some nexus between what they're alleging is harassing and what actually happened in the workplace. And because there's nothing there, that nexus hasn't been established. How would you distinguish the cases he threw out on the Hitler parody and the guerrilla suit? Well, so the Orlando case, the plaintiff in that case was an Orthodox Jewish man whose relatives were directly affected by the Holocaust, who had to sit through a Hitler video during a work training. He complained. His supervisors yelled at him. They showed it again in the training. And then after he complained again, basically his compensation was cut and he was fired. So there were actual things that happened in the workplace following that off-site activity that affected the condition of his employment. So I think Orlando really doesn't support what Mr. Young is trying to do here. And then you look at Tatamy from this court, where the N-word was used repeatedly in the office, graffiti. They hung a noose in the workplace. And that was sufficient, right? Nothing. There's nothing in this case. Well, Mr. Young, part of the complaint, part of the argument, is that there was a racial epithet used in the training video. How do you respond to that? So he's referring to a video that was in the other terms and resources that was dealing with redlining, talking about the history of redlining in this country, where one interviewee who suffered discrimination in the 1950s was talking about her experiences being discriminated against. And she used the N-word in the past test. That video, I think, Mr. Young's attempt to use that video to support a health and work environment claim, I think shows how hollow this claim actually is. The context is totally different. Using the N-word in a video, talking about redlining, when you're the victim of discrimination, doesn't support what happened here. Mr. Young also mentions another part of that video where someone was talking about redlining essentially being affirmative action, and that people don't understand the history of it. And again, I would just point to Justice Jackson's dissent in Students for Fair Admissions, where she discusses the same issues. We may not need to agree, right? Mr. Young doesn't need to agree with these concepts, right? But talking about them does not create a hostile work environment. But don't you think the message with this training is that the state of Colorado agrees with these materials, and they think it's an entirely correct worldview, and that's where they want to move the government workplace, right? I mean, I think that there's an endorsement here of the messages contained. And to the extent Mr. Young perceives those as offensive or directed at him because of his race, doesn't that in a large sense alter the conditions of his employment? No, Your Honor, I would not agree with that. So to your first point, the point of this training was just to discuss and raise awareness of topics. And the way this was framed is not you have to agree. I mean, if you even look at the glossary itself, it never says you have to agree. It says take a look, think for yourself. If you don't agree, cool, examine it, right? That was the message of the training. So you disagree with the argument, the initial argument, that the employees were urged to live this training? I don't want to mischaracterize. Something along those lines. I completely disagree with that characterization. That is absolutely not what the training said or what it was. Look at the glossary itself. It doesn't say you have to agree with these statements. It says you may disagree. Look them up. Examine it for yourself. And so to go into your point, Judge Tempevich, so no, I mean, asking employees, hey, let's think about these topics. As state employees, we need to be mindful of how our actions affect the communities we serve. And being mindful of stuff, that's not an endorsement of everything. Well, that's one interpretation. There are other reasonable interpretations, too, that are more invidious, aren't there? Mr. Young has taken a different interpretation. Right. And so that's the first part of your question. The second part, I'd say, is, again, we have to look at this with a Title VII lens, right? And you may disagree with the policies of your employer. You may disagree with the politics of a current administration, right? That's fine. As members of democratic society, we can, right? But it needs to rise to the level of a Title VII violation. And Mr. Young has an alleged one here. I see my time has expired, unless the Court has any questions. Thank you, Counsel. Thank you. Mr. Trachman, you had some rebuttals. Thank you, Your Honors. On the issue of whether the glossary was part of the mandatory training, I'm not really sure what the dispute remains. Both parties are alleged that it's part of the training. On the reply brief, page 3, the government says, the EDI training referenced the glossary of terms. This glossary was assembled by CDPHE's Office of Health Equity, and the glossary also was designed to curtail all forms of race discrimination. So I'm not sure what their argument is with respect to whether the glossary itself was part of the training or not. Separately, we make several well-pleaded allegations that the glossary itself was part of the training. The government says that EDI trainings are an important part of America. That may be true, but this EDI training is the most egregious I've ever seen, and it has nothing to do with inclusivity or the idea that we can all get along and disagree and have a discussion. The beginning of the glossary says this is meant to provide common language. If you don't agree with it, that's fine. You might evolve, and you might get there. It doesn't say you might be right. It says eventually you will agree with us. In Tadamy and Lowndes, again, those cases involved – neither of them involved a prison, first of all. Tadamy was a brake man in a service unit for trains, and Lowndes was a customer service representative. Their lives were not put in danger by their training. If Josh had been attacked by a prisoner and his colleague had said, you know what, I need to consider whether Josh is using his white fragility or his white privilege, or maybe he needs to be treated differently based on the equity continuum, that would be a terrible risk of Josh's life. Next, I would point the court to the Acevedo case where the Tenth Circuit said that even when the facts are sparse and even when a plaintiff doesn't plead all of the elements of a Title VII claim, they still have a right to state their case and proceed. The district court also erred by doing a free-floating historical context analysis on whether the N-word, which, of course, Tadamy and Lowndes say is always effective on the workplace, was not really here because of the historical context. And last, even if you think we're close on the Title VII claim, the district court went out of her way to do something she had never done before and dismissed the case without even offering us a motion for leave to amend. You mentioned earlier that there was another complaint pending in district court. Is that a complaint filed by Mr. Young also? That complaint is pending in district court with the same district court judge. She has administratively closed that complaint pending the resolution of this case. We don't really know what's going to happen because of the EEOC issue in terms of the right-to-sue letter, and we don't know if the government is going to argue res judicata, so that's why this appeal is important. I thank counsel. Counsel are excused, and the case is submitted.